## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MELISSA AUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3113 |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Melissa Austin appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Austin filed a Motion for Summary Judgment (d/e 12).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should REVERSED and REMANDED.

STATEMENT OF FACTS

Austin was born on September 19, 1962.  She completed high school and one semester of college.  She previously worked as Public Service Administrator for the Illinois Department of Human Services.  She last worked in October 2011.  She suffered from the severe impairment of affective disorder, anxiety, suspected somatoform disorder, substance abuse disorder, fibromyalgia, and vitamin D deficiency.  Austin filed her application for Disability Benefits on January 28, 2013.  R. 31, 33, 45, 59, 86, 323, 387.

On June 20, 2011, Austin saw Dr. Robert Juranek, M.D., for a follow up.  Austin was diagnosed a week earlier with mononucleosis.  Dr. Juranek assessed a viral infection that he suspected was not mononucleosis, but noted a positive test for mononucleosis.  Dr. Juranek concluded that Austin was feeling better so she could return to work.  R. 483.

On October 6, 2011, Austin saw Physician's Assistant Colleen Kelly, PA-C, for a follow-up after an MRI of her head.  R. 476-77.  Austin previously reported having headaches to Kelly.  Austin now reported that her headaches had decreased over the last two days, but she did not feel any better.  Austin reported that she was feeling "poorly" and tired.  On examination, Austin was oriented and had a normal mood and affect.  Kelly

noted that the MRI was negative.  Kelly assessed viral infection and vitamin B12 deficiency.  Kelly stated that overall Austin was improved.  Kelly continued current therapy.  R. 477.  Austin was taking daily doses of alprazolam (Xanax) and tramadol (Ultram) by mouth, and weekly Cyanocobalamin (vitamin B12) injections. R. 476.

On October 13, 2011, Austin saw physician's assistant Kelly for fatigue, headache, and confusion.  R. 473-75.  Austin told her the vitamin B12 injections were not helping.  Austin reported confusion, dizziness, limb weakness, memory loss, decreased concentration, speech difficulties, poor coordination, tingling, and lightheadedness.  Austin said that she had no difficulty walking; no weakness in her face, arms, hands, or legs; no difficulty writing; no numbness or burning sensations; and no vertigo.  She also reported that she had not fallen and was not limping.  R. 473.  On examination, Austin was oriented.  Kelly referred Austin for a consult with an infectious disease specialist and a neurologist.  R. 474.

On October 14, 2011, Kelly completed the health care provider portion of State of Illinois Employee's Own Serious Health Condition form for purposes of securing leave under the Family and Medical Leave Act.  R. 332-35.  Kelly stated that Austin was incapacitated by her mononucleosis infection.  Kelly opined that the infection could last one to two years.  Kelly

stated that Austin suffered from symptoms of excessive fatigue that waxed and waned.  R. 333-34.

On November 7, 2011, Austin saw infectious disease specialist Dr. Janak Koirala, M.D., Ph.D., because she had a positive test for mononucleosis in June of 2011.  R. 356-58.  Austin reported persistent pain, fatigue, headaches, poor sleep, and loss of appetite for the last four months.  She also reported increased anxiety and a panic attack two days earlier.  Dr. Koirala noted that Kelly's examination and workup showed normal results except for a vitamin B12 deficiency.  R. 356.  Austin reported that she smoked cigarettes and she used marijuana.  R. 356.  She also reported that she traveled to Florida in May of 2011.  On examination, Austin appeared tired but healthy.  She had a flat and anxious affect.  She was a good historian, but had trouble finding words.  Dr. Koirala assessed mononucleosis.  Dr. Koirala also suspected depression and anxiety.  Dr. Koirala prescribed alprazolam, tramadol, and an anti-inflammatory nabumetone.  R. 358.

On November 9, 2011, Austin saw neurologist Dr. M.L. Mehra, M.D. On examination, Austin was oriented, her memory was normal, and her abstract reasoning and general knowledge were normal.  Austin's neurological examination was normal.  Dr. Mehra noted that an MRI of

Austin's head was normal.  R. 360.  Dr. Mehra assessed chronic

depression with fibromyalgia.  Dr. Mehra referred Austin to a psychiatrist.

R. 360.

On November 22, 2011, Austin saw physician's assistant Kelly for a

follow up.  R. 468-69.  Kelly noted that all tests were negative except for the

EBV (Epstein-Barr virus).  On examination, Austin's mood and affect were

depressed and flat.  Kelly assessed depression and fibromyalgia.  Kelly

stated that she believed Austin was also suffering from an EBV infection.

Kelly gave Austin samples of Savella.  Kelly referred Austin for a

psychiatric consult.  Kelly advised her to limit her use of alprazolam.  R.

469.

On December 19, 2011, Austin saw physician's assistant Kelly

complaining of fatigue.  R. 465-67.  Austin reported post exertional fatigue,

weakness, poor sleep, myalgias, arthralgias, impaired memory, impaired

concentration, and depression.  Austin said that she had seen a

psychologist twice and was "doing well with it."  R. 465.  On examination,

Austin had a flat, depressed affect.  Kelly assessed fibromyalgia and

vitamin B12 deficiency.  Kelly stopped her prescription for Savella and

added Lyrica.  R. 466-67.

On December 29, 2011, Austin saw physician's assistant Kelly for medication change. Kelly reported that her pain increased in the prior week. On examination, Austin's gait and station were normal. Her mood and affect were labile, but appropriate. Her mood had improved overall. Kelly referred Austin to a rheumatologist and pain specialist for consults. Kelly started Austin on gabapentin (Neurontin). R. 464.

On January 23, 2012, Austin saw physician's assistant Kelly for a follow up. R. 459-61. Austin reported that she was improved somewhat. She said she was still having trouble sleeping. She indicated that she was taking less gabapentin and amitriptyline than prescribed. R. 459. On examination, Austin had a flat, depressed mood. R. 460. Kelly stopped Austin's prescription for Ambien. Kelly discussed good sleep hygiene and recommended no daytime sleeping and no caffeine. Kelly also recommended daily exercise and using the bedroom only for sleep. Kelly also reduced Austin's dosage of alprazolam. R. 461.

On February 16, 2012, Austin saw physician's assistant Kelly. R. 456-58. Austin reported that she was not better since her last visit. She reported that she still was not taking her medicine as prescribed. She also did not change her sleeping habits. She said she slightly increased her exercise the week prior to this appointment. She said her symptoms

waxed and waned.  Austin's husband stated that Austin had not followed up with her counselor.  He stated that Austin had experienced some "rebound anxiety" with four panic attacks in the preceding month.  R. 456. On examination, Austin's mood and affect were tearful and flat.  Kelly told Austin that she had to take her medicine as directed.  Kelly also took Austin off narcotic painkillers and increased her dosage of gabapentin.  Kelly stopped the prescription for hydrocodone and cut back the dosage of tramadol.  Kelly wanted her to stay on a regular sleep schedule.  Kelly also encouraged Austin to see her counselor and to increase exercising.  R. 458.

On March 12, 2012, Austin saw physician's assistant Kelly for fatigue. R. 453-55.  Austin reported that she has been doing quite well since increasing her gabapentin dosage.  Austin stated that, "her anxiety subsided substantially."  She indicated that, "she was still quite fatigued but doing increasingly better."  R. 453.  Kelly stopped the tramadol prescription. Kelly increased the gabapentin dosage and decreased the alprazolam.  R. 455.

On April 3, 2012, Austin saw rheumatologist Dr. Sriya Ranatunga, M.D. for a consultation regarding fibromyalgia.  R. 362-64.  Austin reported, "[H]er fibromyalgia was doing really well" on her current medication.  She

said that she used heating pads and performed stretching exercises daily. She reported that her gabapentin "helps tremendously with her fibromyalgia symptoms." Austin reported that she could perform daily activities "without significant difficulty." R. 362. Dr. Ranatunga's sensory and motor exam of Austin was normal. Austin's gait was normal. Austin's joint examination showed 13 of 18 tender points, full range of motion, and no active synovitis. Dr. Ranatunga assessed fibromyalgia. Dr. Ranatunga said she was doing very well with her current medication. Dr. Ranatunga recommended stretching exercises, meditation, and massage therapy. Dr. Ranatunga referred Austin for aquatic therapy and prescribed a vitamin D supplement. R. 363.

On April 26, 2012, Austin saw physician's assistant Kelly for medication refills. R. 450-52. Austin reported that she was doing somewhat better. She reported that the rheumatologist found a vitamin D deficiency. She reported that she started aquatic therapy prescribed by the rheumatologist. R. 450. On examination, her mood and affect were appropriate but flat. Kelly told Austin it was imperative to get on a regular sleep schedule and to take her Ambien no later than 9 pm. R. 452.

On May 9, 2012, Austin saw a therapist for aquatic therapy. Austin reported that she rode a motorcycle and did a lot of cleaning on the

weekend before this session.  Austin reported that she was very sore.

Austin did not perform all the planned exercises during the session.  The

therapist recommended continuing the current treatment plan.  R. 369.

On May 11, 2012, Austin saw a therapist for aquatic therapy.  Austin

reported feeling much better during therapy with less hip pain.  The

therapist assessed improved tolerance with less pain.  R. 368.

On May 18, 2012, Austin saw a therapist for aquatic therapy.  Austin

reported that her collarbones were sore.  She reported that she went to the

zoo the day before and "walked a lot."  The therapist assessed that Austin

had increased energy and endurance. The therapist recommended

continuation of the current treatment plan.  R. 367.

On June 11, 2012, Austin saw Dr. Dennis Adams, M.D., for

medication refills.  Austin reported that she was doing about the same.

She reported that she had more insomnia.  She indicated that she was still

taking aquatic therapy.  Austin said that her depression was stable with no

significant interval events.  Austin also reported that her anxiety was stable.

On examination, her gait and station were normal, the inspection and

palpation of her joints, bones, and muscles were normal.  She was

oriented, and her mood and affect were normal.  R. 448.  Dr. Adams

adjusted and refilled her prescriptions.  R. 449.

On August 5, 2012, Austin saw Dr. Adams for her vitamin B12 injection, and refills on her prescriptions of alprazolam and tramadol.  R. 443-46.  Austin reported three episodes of severe dizziness in the prior week.  She also reported pain in her hips and clavicle area, as well as fatigue and depression.  R. 443.  On examination, Austin was oriented, had normal gait and station, and normal mood and affect.  Dr. Adams prescribed meclizine for dizziness.  R. 444-45.

On August 29, 2012, Austin saw physician's assistant Kelly. R. 439-41.  Austin complained of depression and fatigue.  Austin also complained of mental fatigue, easy confusion, decreased cognitive functioning, and generalized pain.  On examination, Austin's gait and station were normal; she was oriented; and she had a blunt, flat, and restricted mood and affect. Kelly referred her for neuropsychological testing to determine the source of her symptoms.  R. 441.

On September 17, 2012, Austin saw licensed clinical social worker Emily Lane, LCSW, MSW, for an adult diagnostic interview for possible psychotherapy.  R. 404-07.  Austin reported that she contracted mononucleosis in June of 2011.  She reported that she diagnosed with fibromyalgia in November 2011.  She stated that she "was basically homebound" from November 2011 to March 2012.  She also was

diagnosed with depression.  She said she had poor short-term memory, decreased concentration, decreased energy, and decreased motivation. She stated that she had poor appetite and problems sleeping.  She reported that she stopped drinking alcohol on a regular basis after becoming ill.  She reported that she occasionally used marijuana about once every other week.  She said that in the past she used marijuana for pain relief and to help her sleep, but not anymore.  Lane advised her that marijuana usage may cause depression and anxiety.  R. 404-05.  On examination, Austin's speech was rambling, her thought processes were circumstantial, her insight and judgment were good, her mood was down, and her mood and affect were congruent.  Lane assessed adjustment disorder, chronic with depressed mood and generalized anxiety.  She assigned Austin a Global Assessment of Functioning (GAF) score of 70.  R. 406.  A GAF score of 70 indicated "mild symptoms . . . OR difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well."  American Psychiatric Association, Diagnostic and Statistical Manual (4th ed. Text Rev.) (DSM-IV TR), at 34.[1] Lane recommended

---

[1] The American Psychiatric Association no longer recommends using GAF scores.  American Psychiatric Association, Diagnostic and Statistical Manual (5th ed. 2013) (DSM-5), at 16.

psychotherapy.  R. 407.  Austin saw Lane for psychotherapy from September 2012 through January 2013.

On October 4, 2012, Austin saw neuropsychologist Dr. Chad Noggle, Ph.D., for a neuropsychological evaluation.  R. 386-402.  Austin reported that she began to experience diffuse pain, fatigue, and cognitive impairments.  She stated the cognitive deficits had become worse.  She reported that she was diagnosed with fibromyalgia and put on medical leave.  She reported that she was bedridden from October through December 2011.  R. 386.

She reported having good days and bad days.  She reported that lying in the sunshine in the summer reduced her pain and made her feel more relaxed. She reported that soaking in a hot tub helped alleviate pain. She said that use of marijuana also helped.  She said that standard pain medications did not provide complete relief.  R. 386-87.

Upon completion of his examination and testing, Dr. Noggle assessed mixed neuropsychological performance.  Dr. Noggle found that Austin had normal executive functioning, verbal fluency, processing speed, problem solving, visuospatial processing, visuospatial construction, attention, working memory, and aspects of language (naming, expression, comprehension, and repetition).  Austin showed low average/borderline to

mild impairment in delayed recognition of contextual information, initial learning performance. The results indicated that Austin had some problems with her memory. Overall, Dr. Noggle assessed that Austin had normal neurological functioning. Dr. Noggle stated that her pattern of complaints was consistent with "somatic complaints in the presence of ongoing psychological distress." R. 393. Dr. Noggle assessed cognitive disorder not otherwise specific, undifferentiated somatoform disorder; generalize anxiety disorder, and depressive disorder not otherwise specified. R. 394.

On November 15, 2012, Austin saw psychiatrist Dr. Obiora Onwaumeze, M.D., Ph.D., for a psych adult diagnostic review. R. 416-19. Austin reported recurrent episodes of depression. She said that her current medications were not helping with her depression. She reported that her concentration was poor and her energy level was low. R. 416. Austin reported she smoked, drank socially, and used cannabinoids. R. 417. Austin reported for the last five months, she exercised regularly. She took walks, engaged in Tai Chi, and road a stationary bicycle. She also stayed busy by reading about her illness. On examination, Austin's speech was normal, her insight was limited, her judgment was fair, her mood and affect were gloomy, and her thought processes were concrete. R. 418. Dr.

Onwaumeze assessed major depression, recurrent and moderate; undifferentiated somatoform disorder; and anxiety disorder, general.  He assigned a GAF score of 55.  R. 416.  A GAF score of 55 indicated, "Moderate symptoms . . . Or moderate difficulties in social, occupational, or school functioning."  DSM-IV TR, at 34.  Dr. Onwaumeze recommended continuing her psychotherapy, and suggested changing her medications. Austin decided to keep her current medications for another two months.  R. 419.

On November 27, 2012, Austin saw physician's assistant Kelly for a follow up examination.  R. 433-35.  Austin reported that her condition had improved.  She was happy with the results of Dr. Noggle's examination and she saw progress with her psychotherapy sessions.  R. 433-36.  On examination, she was oriented and had a blunted and flat mood and affect. Kelly noted that Austin had an improved outlook.  R. 435.

On February 25, 2013, Austin saw physician's assistant Kelly.  R. 429-32.  Kelly stated that Austin was stable.  She reported continuing anxiety.  She said that the cold weather made her arthralgias worse.  She did not see her psychiatrist again because he was not in her insurance network.  She reported that she quit smoking. R. 429.  On examination,

Austin's mood and affect were flat and labile.  R. 431.  Kelly started Austin on Effexor for depression/anxiety/fibromyalgia.  R. 432.

On April 2, 2013, state agency psychologist Dr. Richard Hamersma, Ph.D., opined that Austin suffered severe mental impairments from affective disorders, anxiety disorders, and the effects of fibromyalgia.  R. 81.  Dr. Hamersma opined that Austin's mental impairments caused moderate limitations on her activities of daily living, social functioning, and her ability to maintain concentration, persistence, or pace.  R. 82.  Dr. Hamersma opined that even with her mental impairments, she retained the ability to understand, remember, and carry out simple routine and detailed instructions involving one to three steps.  He further opined that she had the mental capacity to complete simple, routine tasks.  Dr. Hamersma also opined that Austin needed to have minimal contact with others.  R. 86.

On May 8, 2013, Austin saw state agency physician Dr. Vittal Chapa, M.D., for a consultative physical examination.  R. 517-20.  Austin reported that she had fibromyalgia, a vitamin D deficiency, generalized anxiety disorder, depression, and a history of mononucleosis.  Austin reported headaches, pain throughout her body including her collarbones, shoulders, neck, back, hips, and all extremities.  R. 517.  On examination, Austin could ambulate without aids and her gait was normal; her handgrips were

5/5 bilaterally; she could perform gross and fine manipulations; she had full range of motion in all her joints; and she had no evidence of joint redness, heat, swelling or thickening.  Dr. Chapa observed no specific trigger points. R. 518. Dr. Chapa found that her physical exam was "essential unremarkable."  Dr. Chapa listed his diagnostic impression as fibromyalgia, history of fatigue, and history of anxiety disorder.  R. 519.

On May 15, 2013, state agency physician Dr. Lenore Gonzalez, M.D., opined that Austin's physical impairments were not severe.  R. 81.

On June 18, 2013, Austin saw nurse practitioner Mary Ely, NP, to transfer care from physician's assistant Kelly and to establish care as a new patient of Ely.  R. 533-35.[2]  On examination, Austin was oriented, had normal mood and affect, normal judgment, intact memory, and normal gait and station.  R. 535.  Ely refilled Austin's prescription for clonazepam (Klonopin) and referred Austin for physical therapy.  R. 535.

On June 30, 2013, Austin saw a physical therapist for an evaluation. The therapist noted a range of motion and muscular asymmetry in Austin's hips that affected her gait.  The therapist recommended four to six weeks of physical therapy.  R. 538.

---

[2] The signature page is omitted from the office visit record.  The Court determined that Austin saw Ely on this occasion because Ely was the healthcare professional who prescribed the medication and referred Austin for physical therapy noted under the heading "Plan" portion of the record.  R. 535.

On July 10, 2013, Austin saw nurse practitioner Ely.  R. 529-32. Austin saw Ely for a follow up on a recent change in her medication to Cymbalta.  Ely had discontinued other medications.  Austin reported that the Cymbalta was working for her depression and fibromyalgia.  On examination, Austin had normal gait and station.  Inspection and palpation of her joints, bones, and muscles was normal.  Austin's mood and affect were normal.  Ely continued the Cymbalta prescription with gabapentin and clonazepam.  R. 532.

On Thursday July 25, 2013, Austin saw nurse practitioner Ely. R. 526-28.  Austin reported intolerable pain since Monday.  Austin was taking alternating doses of Tylenol and Motrin, but was unable to sleep.  Austin reported that she felt better when she was in the sun.  R. 526.  On examination, Austin had normal gait and station.  Inspection and palpation of her joints, bones, and muscles was normal.  Austin's mood and affect were normal.  Ely increased Austin's Cymbalta dosage.  R. 528.

On September 11, 2013, Austin saw nurse practitioner Ely for a semiannual follow up of her chronic pain and fibromyalgia.  R. 522-25. Austin reported that the physical therapy made the fibromyalgia pain worse. She also reported pain in her left ribs for three days after she had a coughing episode the week before.  R. 522.  On examination, Austin had

normal mood and affect, and normal gait and station.  R. 524.  Ely gave Austin a dose of extra strength Tylenol, refilled her prescriptions, prescribed an antihistamine hydroxyzine for insomnia, and referred Austin for mental health outpatient examination and testing.  R. 525.

On December 3, 2013, state agency psychologist Dr. Michael Schneider, Ph.D., agreed with Dr. Hamersma's April 2, 2013, opinions that that Austin's suffered severe mental impairments from the affective disorders, anxiety disorders, and the effects of fibromyalgia.  R. 97.  Dr. Schneider affirmed and reiterated Dr. Hamersma's other opinions.  R. 99-102.

On December 4, 2013, Austin saw nurse practitioner Ely for a follow up on her medications.  R. 582-85.  Austin reported reduced intensity and frequency of her fibromyalgia pain since she started working out twice a week at Gold's gym.  Austin noted increased anxiety.  She stated that she was taking her clonazepam as instructed.  She reported temporary pain in her hands on the previous Saturday.  She also reported that her knees "snap, crackle, and pop" since she began working out.  R. 582.  On examination, Austin had normal mood and affect, and normal gait and station.  Ely also noted, "Inspection/palpation of joints, bones, and muscles:

Abnormal.  Point tenderness and palpable crepitus (audible too) right knee."  R. 584.  Ely renewed Austin's prescriptions.  R. 584-85.

On December 6, 2013, state agency physician Dr. Charles Wabner, M.D., affirmed Dr. Gonzalez' May 15, 2013, opinion that Austin's physical impairments were non-severe.  R. 97.

On March 10, 2014, Austin saw nurse practitioner Ely for a health maintenance examination, checkup, and labs.  R. 571-75.  Ely praised Austin for coming to the appointment alone, without her husband to accompany her.  Austin was proud of her accomplishments.  Austin reported bilateral knee pain.  She also reported chronic pain and that she was taking her medication as needed.  R. 571.  On examination, Austin was oriented and had a normal mood and affect.  She had a normal gait and station.  Inspection and palpation of her joints, bones, and muscles showed abnormal results.  Ely observed swelling in the medial surface of the right knee.  R. 574.  Ely renewed her prescriptions.  Ely noted, "Melissa has come a long way in her recovery of chronic syndromes of pain and anxiety."  R. 575.

On June 3, 2014, Austin saw nurse practitioner Ely for a chronic recheck.  R. 558-62.  Austin reported that she started seeing Amy Jennings

for her anxiety.  R. 558.[3]  On examination, Austin was oriented and had a normal mood and affect.  She had a normal gait and station.  Inspection and palpation of her joints, bones, and muscles were abnormal.  Austin's left wrist was tender on palpation.  Austin reported the wrist was infrequently tender when unscrewing a jar.  Ely recommended continuing her counseling sessions with Jennings.  R. 561.

On Tuesday August 19, 2014, Austin saw nurse practitioner Ely for a recheck on chronic pain.  R. 550-55.  Austin reported continuing pain in her left wrist, swelling in her right knee, and chronic aches.  Austin said she had right knee swelling and pain since Saturday.  Austin stated she walked at the fair, and she attended a wedding.  She wore high heels to the wedding.  She suffered no injuries.  R. 550.  On examination, Austin was oriented, had a normal mood and affect, and had a normal gait and station.  Ely observed swelling in the left wrist and right knee.  The left wrist and right knee were tender on palpation, with no warmth, masses, clicks, or crepitus.  Ely renewed Austin's methadone prescription for chronic pain, and prescribed ibuprofen for her knee.  R. 554.  Ely recommended wearing a sleeve on Austin's right knee when walking.  R. 555.

---

[3] Amy Jennings is not otherwise identified in the record or by the parties.

On November 7, 2014, nurse practitioner Ely prepared a form entitled, "Social Security General RFC Questionnaire."  R. 595-602.  Ely opined that Austin's pain interfered with her attention and concentration either frequently or constantly.  Ely opined that Austin was incapable of tolerating even low stress jobs.  Ely indicated that Austin's symptoms caused Austin to be unable to maintain persistence or pace.  Ely also opined that Austin had marked limitations in her ability to perform activities of daily living.  Ely said that Austin needed to lie down during the day, and Austin would miss four or more days of work per month.  Ely noted that Austin's fatigue would severely impair her ability to work, and Austin would need additional breaks at work.  Ely stated that Austin could occasionally lift up to 10 pounds, but never lift 20 pounds or more.  Ely also opined that Austin could walk ½ block, sit for 10 to 20 minutes, stand for 10 minutes, and need to change positions at work every 10 minutes.  Ely also indicated that Austin could never climb, kneel, crawl, or perform overhead work; and could occasionally perform other postural actions.  Ely opined that Austin had poor manual dexterity and could not perform repetitive activities with her upper extremities.  Ely said that Austin could sit a total of less than two hours and stand/walk for a total of less than two hours in an eight-hour workday.  Ely also said that Austin's mental impairments markedly limited

her ability to perform activities of daily living and social functioning; and extremely limited her ability to maintain concentration, persistence or pace. Ely said that Austin had repeated episodes of decompensation, at least three episodes a year with each lasting for two weeks.  R. 595-600

Ely indicated that Austin had either poor or no ability to do the following:  understand, remember and carry out instructions; deal with others in an employment setting; tolerate workplace routine supervision, instruction and criticism; deal with changes in routine work settings; make workplace decisions and exercise judgment; maintain attention and concentration; complete a normal workday; sustain a normal work routine; work with or near others; be punctual and work on a schedule; and maintain social appropriate behavior.  R. 600-01.

<u>THE EVIDENTIARY HEARING</u>

On November 14, 2014, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 53-76.  Austin appeared with her attorney.  Vocational expert Bob Hammond also appeared.  R. 55.

Austin testified first.  She said she lived with her husband in a two-level home that sat on seven acres.  Her husband drove her to the hearing. She said she drove once every couple of months.  She testified that prior to the last year, she did not drive because of her anxiety.  R. 59, 63.

Austin said she completed high school and one semester of college. She worked for the Illinois Department of Human Services as a liaison for the All Kids program. She testified that the job was "pretty much a desk job." R. 60. Austin stated that she stopped working because of fatigue and pain. She indicated that there were days when all she could do was get up, shower, and go back to bed. R. 60-61.

Austin said she used to ride a motorcycle with her husband. Her husband drove the motorcycle; she sat on the rear and held onto him. She testified that she last rode on a motorcycle in the summer of 2013. R. 62-63. Austin stated that she and her husband had a golf cart. She drove the golf cart around their seven acres, but once she mistakenly stepped on the accelerator instead of the brake and almost hit the garage. R. 63.

Austin said she helped her husband with the gardening on their property, but "not as much as he'd like or he needs." She testified that they owned a pool. Being out in the sun on warm days by the pool "takes away my pains." She did aqua therapy exercises in the pool. The exercises consisted of walking in the pool forward and backwards, along with leg lifts and moving her arms. The pool was not heated, so she only did these exercises in the summer when the pool water was warm enough. R. 64.

Austin said she took care of her own hygiene and dressed herself. Her husband had to remind her to take showers. She sometimes became dizzy in the shower. R. 65.

Austin testified about getting out of the house. She said she went to doctor's appointments. She also went to a small IGA grocery store near her home. She last went to the IGA four weeks before the hearing. Her husband took her out to dinner once every three weeks to get her out of the house. She stated that in the summer of 2014, she attended two weddings of friends' children. She and her husband did not stay long at the weddings. She said that crowds were overwhelming. She got "like sensory overload in my brain" when she was in a crowd. She also attended family functions like birthday parties for nieces and in-laws. She could not always make such parties. R. 67.

Austin testified that she became dizzy when her pain flared up. This occurred about once every two weeks. She also said she could be dizzy for no apparent reason while walking in her home. Austin indicated that her husband did the cooking and cleaning at home. She said she cooked maybe three meals in the three years before the hearing, and she "probably messed them up." R. 68.

Austin testified that she injured her wrist within the last year before the hearing.  She received a cortisone shot in the wrist.  Her wrist did not hurt and was not a problem at the time of the hearing.  She said she did not have any problems using her hands.  R. 69.

Austin indicated that she had swelling in her knees and her collarbone.  She also said that her hands, feet, and ankles became swollen in the heat.  R. 69.  Austin stated that she had experienced problems with her knees for the previous five years.  The problem with her knees was getting worse.  R. 70-71.

Austin opined that she could only walk less than a block without experiencing pain and discomfort.  She could stand for half an hour.  She said after that, she became so fatigued that "my body wants to give out."  She testified that she fell three weeks before the hearing.  R. 69-70.

Austin said that her symptoms waxed and waned.  She could go a month without debilitating symptoms, but then be down for two weeks straight.  She opined that on average she had four to five good days a month.  R. 70.

Austin said she was very nervous and anxious at the hearing.  She said that she suffered from anxiety and depression.  She had panic attacks

about once a month.  During an attack she would start shaking and lose

her breath.  She tended to hyperventilate and become dizzy.  R. 70-71.

The ALJ asked Austin about her marijuana use.  Austin testified that

she did not smoke marijuana at the time of the hearing.  She said she tried

marijuana early in her illness because others recommended it for pain

relief.  She testified that the marijuana did not work to relieve pain.  R. 75.

Vocational expert Hammond also testified.  The ALJ asked Hammond

the following hypothetical question:

> Assume past work activity the same as the claimant's who
> has the capacity limited to light work. No climbing of ladders,
> ropes or scaffolding.  Other postural functions occasionally.
> Need to avoid -- hazards such as unprotected heights,
> dangerous machinery.
> Also a need to alternate between a standing position and
> sitting position, not at will but periodically as circumstances
> would allow so that by the end of the day, the  individual could
> still stand would be five to eight hours, and sit for three of them
> -- also the limitation to the performance of simple and repetitive
> tasks . And -- little or no change of work -- occasional
> interaction with co-workers and supervisors. Of
> course the past work is --
> . . . .
> -- and assuming a hypothetical individual of the claimant's
> age and education, work experience, in your opinion would
> there be unskilled, light work in the State of Illinois that such a
> person can perform?

R. 73.  Hammond opined that such a person could perform the job of bench

assembly, with 1,000 such jobs in Illinois, and 60,000 nationally.

Hammond opined that this was the only position he could identify that such

a person could perform.  R. 73-74.  Hammond opined that such a person

could not be absent from work more than one and one-half days a month.

R. 74. The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on February 17, 2015.  R. 31-47.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Austin met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity since October 21, 2011, and she suffered from the severe impairments of affective disorder, anxiety, suspected somatoform disorder, substance abuse disorder, fibromyalgia, and vitamin D deficiency. R. 33.

The ALJ found that Austin's impairments or combination of impairments did not meet or equal a Listing. The ALJ stated that he followed the guidelines in Social Security Ruling (SSR) 03-2p in

considering the limiting effects of Austin's fibromyalgia for purposes of Step 3. R. 34. The title of SSR 03-2p, "Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome." SSR 03-2p, 2003 WL 22399117 (October 20, 2003).

The ALJ considered Listings 12.04, 12.06, 12.07, and 12.08 for various mental impairments. For purposes of these Listings, the ALJ found that Austin had mild limitations on activities of daily living. The ALJ relied on her testimony that she drove occasionally, shopped at the local IGA, dressed herself, and did some gardening. The ALJ stated that Austin testified that any limitations in these areas was due to physical pain rather than her mental condition. R. 34.

The ALJ found that Austin had moderate restrictions in her social functioning. The ALJ relied on evidence that she participated in family social functions including a trip to the zoo, she attended weddings, and went to the fair. The ALJ also relied on the testimony that she went out occasionally to shop at the IGA. She was also cooperative at her medical visits and often had normal mood and affect. The ALJ also noted that Austin did not testify that she had problems getting along with other people. R. 34.

The ALJ found that Austin had moderate difficulties in maintaining concentration, persistence or pace. The ALJ found that the evidence in the record did not support Austin assertions that she had marked (rather than moderate) limitations in this area. The ALJ noted that she drove occasionally, shopped at the IGA, followed a regular workout routine at Gold's gym twice a week, and did some gardening at home. The ALJ found that these activities required concentration and memory, persistence and the ability to maintain pace. The ALJ also relied on Dr. Mehra's findings that her memory was normal, on Dr. Chapa's observation that she was a good historian, and Dr. Noggle's finding that she had normal performances in executive functioning, verbal fluency, processing speed, problem solving, attention, memory, and language. R. 35. The ALJ found no medical records of treatments for periods of decompensation. R. 35.

At Step 4, the ALJ found that Austin had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: the claimant may not climb ladders, ropes, or scaffolds; the claimant may perform other postural functions occasionally; the claimant may perform manipulative functions frequently; the claimant must have the option to alternate periodically from standing to sitting and vice versa during the day, not at will but as circumstances allow, so that by the end of the work day the individual could stand up to 5 hours per day and sit up to 3 hours per day; the claimant must avoid hazards; the claimant is limited to the performance of simple and repetitive tasks

involving little or no change in work routine, and only occasional interaction with the public, coworkers and supervisors.

R. 36.  The ALJ relied on the medical examinations that showed normal strength, reflexes, range of motion, and gait; and Dr. Chapa's finding that she had the ability to perform fine and gross manipulations. The ALJ acknowledged fibromyalgia symptoms and problems with her knees, but found that was consistent with a restriction in the RFC to a limited range of light work. R. 41-42.  The ALJ noted that Austin has undergone relatively conservative treatment, and Austin reported improvement when she was compliant with the treatment.  The ALJ also relied upon evidence of her activities, including her regular exercise program and Tai Chi program, her trips to the zoo and the two weddings.  The ALJ noted that Austin had submitted a detailed letter providing details about her symptoms and limitations.  The ALJ disregarded the letter because Austin had not reported the degree of these symptoms to her medical providers.  R. 52. The ALJ concluded that the record did not support the level of debilitating pain and other symptoms reflected in Austin's testimony.  R. 42.  The ALJ acknowledged that Austin had moderate limitations in social functioning and her ability to maintain concentration, persistence or pace.  The ALJ found that these limitations were adequately addressed by limiting her to

simple and repetitive tasks and to occasional interaction with coworkers, supervisor, and the public.  R. 44.

The ALJ also noted that Austin's mental functioning would improve if she abstained from using marijuana due to side effects that could cause increased anxiety and depression.  The ALJ found that the RFC was accurate even if she did not abstain from marijuana use.  R. 43.

The ALJ gave Ely's November 7, 2014, opinions negligible or minimal weight.  The ALJ said the opinion "posits that the claimant is essentially helpless both physically and mentally." The ALJ found that the opinions were not supported by Ely's treatment notes and were inconsistent with Ely's findings that Austin was oriented and had normal mood and affect. The ALJ also found that the opinions were inconsistent with other evidence in the record regarding Austin's activities and normal physical examinations.  R. 44-45.

The ALJ considered the opinions of state agency physicians Drs. Gonzalez, Wabner, Hamersma, and Schneider.  The ALJ found their opinions supported the findings at Steps 3 that Austin's impairments did not meet or equal a Listing.  The ALJ stated that the RFC was based on all the evidence in the record including evidence not before the state agency.  The ALJ found that Austin's testimony indicated that all of her moderate

limitations in activities of daily living were attributable to her physical limitations rather than mental.  R. 45.

The ALJ found at Step 4 that Austin could not perform her prior work with the Department of Human Services.  At Step 5, the ALJ found that Austin could perform a significant number of jobs in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Hammond that a person with Austin's age, education, experience, and RFC could perform a bench assembly job.  The ALJ concluded that Austin was not disabled.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

　　　In this case, the ALJ erred by analyzing Austin's fibromyalgia under

the standard set forth in SSR 03-2p for analyzing Reflex Sympathetic

Dystrophy Syndrome / Complex Regional Pain Syndrome (RSDS/CRPS).

R. 34.  SSR 03-2p concerns RSDS/CRPS.  Social Security Ruling, SSR

03-2p:  Titles II and XVI:  Evaluation of Cases Involving Reflex Sympathetic

Dystrophy Syndrome/Complex Regional Pain Syndrome, SSR 03-2p, 2003

WL 22399117 (October 20, 2003).  Fibromyalgia should be analyzed under

SSR 12-3p.  Social Security Ruling, SSR 12-2p; Titles II and XVI:

Evaluation of Fibromyalgia, SSR 12-2p, 2012 WL 3104869 (July 25, 2012).

RSDS/CRPS and fibromyalgia are quite different and require very different analyses to determine whether a person with each condition is disabled.  RSDS/CRPS is a chronic pain syndrome usually resulting from some trauma.  The pain is associated with swelling, autonomic instability, abnormal hair and nail growth, osteoporosis, and involuntary movements in the region of the initial injury.  SSR 03-2p, 2003 WL 22399117, at *1-*2.  Fibromyalgia is characterized by widespread pain in joints, muscles, tendons, and nearby tissue.  Fibromyalgia is also associated with fatigue and memory problems.  SSR 12-2p, 2012 WL 3104869, at *1-*2.

Fibromyalgia cannot be diagnosed with any objective tests or scans.  The symptoms of fibromyalgia are almost entirely subjective.  See Sarchet v. Chater, 78 F.3d 305-307 (7th Cir. 1996).  An acceptable medical source must establish a history of widespread pain, the existence of specific tender points, and/or associated symptoms of fatigue.  Laboratory tests are used to exclude other possible causes.  SSR 12-2p, 2012 WL 3104869, at *3.  A diagnosis of RSDS/CRPS requires intense pain in or near the location of the injury associated with the specific signs of swelling, autonomic instability, abnormal hair or nail growth, osteoporosis, or involuntary movements.  SSR 03-2p, 2003 WL 22399117, at *2.

The use of the RSDS/CRPS standard in SSR 03-2p fails to provide a meaningful analysis of the existence and severity of fibromyalgia. It is difficult to determine the severity of fibromyalgia because of the unavailability of objective clinical testing. Sarchet, 78 F.3d at 306. Persons with fibromyalgia also may only receive conservative treatment because more involved treatment is not available. See Marshall v. Colvin, 2015 WL 122410, at *6 (S.D. Ill. January 8, 2015). An assessment of fibromyalgia requires careful consideration of the longitudinal record because the symptoms of fibromyalgia will wax and wane and persons with fibromyalgia will have good days and bad days. See SSR 12-2p, 2012 WL 3104869, at *6. Hence, a person with fibromyalgia may be able on occasion to exercise or perform housework or yardwork or have relatively normal findings on examination, as Austin did, but still not be able to sustain work activity sufficiently to be able to engage in substantial gainful activity. The RSDS/CRPS analysis focuses on progression of the specific medical signs associated with that disease: swelling, autonomic instability, abnormal hair and nail growth, osteoporosis, or involuntary movements in the region of the initial injury; as well as, evidence of the limiting effect of the individual's symptoms, including pain, affect functional capacities. See SSR 03-2p, 2003 WL 22399117, at *6-*7. The RSDS/CRPS standard would not

adequately evaluate fibromyalgia.  The ALJ's use of that standard is clearly error.

The Commissioner argues that the error was harmless because the ALJ found that Austin's fibromyalgia was a severe impairment at Step 2, and partially credited Austin's allegations of fibromyalgia-related symptoms. Commissioner's Memorandum in Support of Motion for Summary Judgment (d/e 18), at 4 n.2.  The Court disagrees.  The ALJ's decision does not demonstrate that the ALJ adequately considered the waxing and waning effect of Austin's fibromyalgia when evaluating evidence such as her periodic ability to engage in certain activities, relatively normal findings at some medical examinations, and the opinion of her primary care provider Ely.  The ALJ noted that Austin's treatment had been "essentially routine and conservative in nature".  R. 42.  However, there is no medical evidence to indicate that any other kind of treatment is available for fibromyalgia. The ALJ may not discount the severity of Austin's fibromyalgia in the absence of any medical evidence that something other than routine and conservative care is available.  Marshall v. Colvin, 13-cv-1266, 2015 WL 122410 at *6 (SDIL. 1/8/2015).

The ALJ should consider all the evidence in light of the waxing and waning effect of Austin's fibromyalgia.  For instance, the ALJ discounted

Austin's claims of disabling pain citing the fact that she exercised twice a week at a gym.  R. 43.  This was based on Austin's statement made on December 4, 2013.  R. 582.  The ALJ disregarded Austin's statement made on November 12, 2014 that she can exercise Monday and Tuesday because she is trying, but is down for six days.  R. 340.  Likewise, the ALJ indicated Austin's claim of pain was not supported because she was riding a motorcycle.  R. 43.  This was based on a statement made on May 7, 2014, which indicated Austin rode a motorcycle "this weekend".  R. 369.  The ALJ disregarded Austin's 2014 statement that she had to stop riding her motorcycle due to her dizzy / fainting spells.  R. 341.

The error, therefore, was not harmless.   The matter should be remanded for further consideration under the appropriate legal standard.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) should be DENIED; Plaintiff Melissa Austin's Motion for Summary Judgment (d/e 12) should be ALLOWED; and the decision of the Defendant Commissioner should be REVERSED and REMANDED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   August 9, 2018

_s/ Tom Schanzle-Haskins_
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE